CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CAREL ALE (Bar No. 283717 )
E-Mail: carel_ale@fd.org
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
YUSUF ANIFOWOSHE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> YUSUF ANIFOWOSHE, <br><br> Defendant. | Case No. 21-CR-00203-ODW-6 <br><br> **OBJECTIONS TO THE PRESENTENCE REPORT; POSITION WITH RESPECT TO SENTENCING** <br><br> Sentencing Date: <br> September 12, 2022 at 10:00 a.m. |

Yusuf Anifowoshe, by and through his counsel of record, Deputy Federal Public Defender Carel Alé, and the United States, hereby files this Objection to the Presentence Report and this Position with Respect to Sentencing. This filings is based on the attached Memorandum of Points and Authorities, exhibits, and all other files in this case.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 22, 2022        By  /s/ Carel Alé
                              CAREL ALÉ
                              Deputy Federal Public Defender
                              Attorney for YUSUF ANIFOWOSHE

## I. INTRODUCTION

To his family and frinds Yusuf Adekinka Anifowoshe ("Mr. Anifowoshe") is a hardworking man of tremendous faith and moral conviction. He finds himself before this Court not out of greed or addiction—he did not receive a single cent from the conspiracy—but because of a misguided attempt to assist his young niece. He is ashamed. Mr. Anifowoshe should have known better, and he did; but he faltered when he failed to grasp the damage his conduct would inflict. Mr. Anifowoshe is a better man than his conduct in this case suggests. As his family and community share with this Court, they know Mr. Anifowoshe is a better man.

Mr. Anifowoshe grew up in New York, the oldest child and son of hardworking immigrant parents from Nigeria and an incredibly close knit family. Because his parents dedicated themselves to providing for their children, Mr. Anifowoshe had an outsized role in raising his younger siblings. He was, according to his siblings and family friends, the anchor for his family and a second father for his siblings. Mr. Anifowoshe made sure that his siblings did their homework, went to practices, ate dinner, and generally looked after them while his mother worked long hours as a nurse. Mr. Anifowoshe's family and friends know him to be a loving, dependable, and deeply faithful man; they are the traits he hopes his soon-to-be born son learns from him as well.

Mr. Anifowoshe deeply regrets his complicity in the scheme and accepts responsibility for his conduct in this case. Throughout the last year, Mr. Anifowoshe has endeveared to show this Court and his friends and family that his participation was a mistake, one he deeply regrets, but one that does not otherwise define him. Mr. Anifowoshe, who received *no* money or any type of compensation for his involvement, hopes that this Court will see in him a hope .

Mr. Anifowoshe respectfully asks for a time-served sentence or a term of probation followed by a six-month term of home confinement. Mr. Anifowoshe recognizes that this sentence is outside of the Guidelines sentence recommendation but believes that will be responsible for a significant restitution amount

2

## II. OBJECTIONS TO THE PRESENTENCE REPORT

A. **Factual Objections**

Mr. Anifowoshe respectfully objects to the following factual statements in the Presentence Report, (Dkt. 96 ("PSR")):

- Aliases: Watkins Jr., Adriel; Oyesanya, Gabriel O.; and Robinson, Rakeem R. Mr. Anifowoshe has not used those aliases.
- Alternate State ID Numbers: NY14092008; GA4702517A; FL08143235. Mr. Anifowoshe has not used those identifications.
- Alias SSN: xx-8x-xxxx. Mr. Anifowoshe has not used that social security number. It appears to be one digit off from his actual social security number and might have been an error.
- Para. 24 explains that "[c]oconspirators, including Anifowoshe took steps to further the false stories and artifices, to induce the victim into paying additional funds," and then lists a number of over acts. Mr. Anifowoshe did once pretend to be an employee of a U.S. bank but did not engage or participate in "filing a Fictitious Business Name Statement with the Los Angeles County Registrar-Recorder/County Clerk's Office," or "opening a bank account in Los Angeles County."

B. **A Departure Based on §5H1.6, Family Ties, and §5H1.11, Civic Service, Is Warranted**

As further elaborated below, *infra* III.A.1., a departure based on U.S.S.G. §5H1.6 and §5H1.11 is appropriate in this case. U.S.S.G. § 5H1.6, Family Ties and Responsibilities (Policy Statement), Application Note 1(B); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (explain that "parental responsibilities can be extraordinary" and finding that where the defendant "faced more than the responsibilities of . . . even . . . those of an ordinary single parent," "[t]he rationale for a downward departure [was] not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely

solely on the defendant for their upbringing"; "the departure was not on behalf of the defendant herself, but on behalf of her family"); *United States v. King*, 201 F. Supp. 3d 167 (D.D.C. 2016) (downward departure to three years' probation with condition of evening home confinement with location monitoring was appropriate where defendant was sole caretaker of seven-year-old daughter who would otherwise become a ward of the state); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (allowing a downward departure for community service that was "hands-on" and likely had a dramatic and positive impact on the lives of others).

### III. ARGUMENT

A.   18 U.S.C. §3553(a) Factors

Since *Booker*, the Supreme Court has clearly stated that the Sentencing Reform Act of 1984, rather than the Sentencing Guidelines, governs sentencing decisions. *United States v. Booker*, 543 U.S. 220, 260-61, 125 S. Ct. 738, 765 (2005); 18 U.S.C. § 3553(a). The Guidelines are no longer the only, or even the primary, consideration in fashioning a sentence in a particular case—they are purely advisory. *Id*. Rather, the district court is governed by the "overarching statutory charge" to "impose a sentence sufficient, but not greater than necessary" to reflect the "seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a) and (a)(2)).

As a result, a judge's choices in sentencing a particular defendant have been greatly expanded. *Cunningham v. California*, 549 U.S. 270, 286, 127 S. Ct. 856, 867 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines). While judges are required "to take account of the Guidelines together with other sentencing goals," they "may not presume that the Guidelines range is reasonable." *Gall v*, 552 U.S. at 50. Courts may vary from the ranges in the Guidelines based upon "policy considerations" or mere "disagreement" with the Guidelines. *Kimbrough v.*

4

*United States*, 552 U.S. 85, 100, 128 S. Ct. 558, 570 (2007). Moreover, in a particular case, a sentencing judge may conclude that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," that "the case falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," or simply that "the case warrants a different sentence regardless." *United States v. Rita*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007).

### 1. Mr. Anifowoshe's History and Characteristics

Mr. Anifowoshe is a kind, loving, and loyal person. He is blessed with a strong network of family and friends that will support him going forward as he becomes a new father and gets his life back on track.

Mr. Anifowoshe was born to the union of Yinka and Tina Anifowoshe on September 3, 1994, in Staten Island, New York. (PSR, ¶75.) He is the eldest of four children born to both his parents. (*Id.*, ¶76.) After his parents immigrated to the United States from Nigeria, his mother worked as a nurse in the United States and his father as a business owner. Although it took them away from their children, thanks Yinka and Tina's hardwork the Anifowoshe family enjoyed a sense of financial and familial stability. (*Id.*)

When Mr. Anifowoshe was 11 years old, however, his parents separated. (*Id.*, ¶78.) While this separation did not create financial instability, it did change the family dynamics. Mr. Anifowoshe's mother worked long hours as a nurse and as a result Mr. Anifowoshe took a larger parenting role with his siblings. As Mr. Anifowoshe's sister Aminat explains,

> Since [Yinka Anifowoshe] wasn't around [Mr. Anifowoshe] stepped up and he was the head of the household right along with my mother. Growing up, me and him was the closest, I could go to him for anything and he would try his best giving the best advice and helping me if need be. To start off, he's been a major influence in my life and the reason why I have such a good head on my shoulders. I always followed in his footsteps, Since he was a great athlete, I told myself I am going to follow in his footsteps. He played football and ran track. I, myself, ran track too. . . . Before every single race I called him and he gave the best pep talks, he supported my biggest races. He was/ is basically my second dad.

Ex. A (Letter from Aminat Anifowoshe). Mr. Anifowoshe's sister Zainab Anifowoshe echos those sentiments:

> My brother has always been a father figure to me and my siblings. Growing up he took the responsibility of raising myself and siblings alongside my mother. Every holiday, birthday and family event my brother made sure we were happy. Yusuf has always been our go to person for advice, help and support. For me especially I can't begin to say how much Yusuf means to me. I was a young mom. I had my daughter at the age of 19 years old. From the day I brought my daughter home my brother has been my rock. He has been more than just an uncle to her. He takes her to my daughter like his own child.

Ex. B (Letter from Zainab Anifowoshe). *See* Ex. C (Letter from Rushell Wilson) ("The number one thing I love about [Mr. Anifowoshe] is the love he has for his immediate family such as his mother, brother, and sisters."). As Mr. Anifowoshe's cousin put it best, Mr. Anifowoshe "has been the anchor to his whole family[.]" Ex. D (Letter from Samson Adeoye).

Mr. Anifowoshe's dedication to his family and his sweet nature was evident to others outside of his family as well. As Justine James, the mother of one of Mr. Anifowoshe's lifelong friends and a family friend, tells the Court,

> Yusuf's history is just like any other child's. He was always extremely sweet, but also a loud and funny child to be around. He was always ready to help out, especially with my six children who he acted as a brother to. I remember when instead of going out and playing at the local park, he would come with my son Josh and watch my younger children play T-Ball all day, in my opinion that is definitely not something a teenager would do for fun but he came to support them anyway. Other times if he was not helping me, he was helping out his mother. His mother works extremely hard as a nurse and was always very busy trying to do her best to support him. I remember the times he would go out and buy his mother food so that she did not have to worry about the stress of making dinner, or the times in which he would save up all his money to buy me and her spa gift certificates so that we both could get a break from our
> busy lives.

Ex. E (Letter from Justine James). Another long time friend, Tricia Ross, who has known Mr. Anifowoshe for nearly 14 years since they were both teenagers shares,

> I have always known Yusuf to be a very selfless person who would give his shirt off his back for those in need. One specific example includes donating his clothes to a fellow teammate in foster care with little to no clothing for school or football practice. The student was very appreciative of this act of

|   |   |
|---|---|
| 1 | kindness, and throughout the years, Yusuf has never strayed from his caring nature, always helping anyone he meets along the way. . . . Yusuf is encouraging; he speaks life into my dreams and goals and has more confidence in me than I have in myself. He motivates me to reach for the stars, and I know I can always count on him to keep me on track. |

Ex. F (Lettter from Tricia Ross). *See also* Ex. G (Letter from Gillian Foster) (Mr. Anifowoshe "has also been very caring, responsible, and dependable as a friend. He is always available to step in and care for my grandson who is also his god child. In times of need, Yusuf can always be counted on to uplift peoples' spirits with a good laugh and an ear to listen in times of need.")

Growing up, Mr. Anifowoshe's commitment to his family and his friends was only rivaled by his love and dedication to football and his faith. Mr. Anifowoshe is a lifelong athlete and he played football throughout high school and into college at Alfred State College. (*See* PSR, ¶88.) Football provided Mr. Anifowoshe a goal and he shone as a student athlete with dedication and focus early on. *See* Ex. H (Letter from Gabriel Oyesanya) ("During our years as peers in our high school instituting, Yusuf always expressed leadership skills, which showed zeal and grit that allowed everyone around him to follow in positive ways."); Ex. I (Letter from Niah Khan) ("When I met Yusuf, he would always express his passion for sports as he played quarter back from his high school team and also some of his college years."). Mr. Anifowoshe was a star athlete. His freshman year he was the starting quarterback and by his sophomore year he was picked as a "Big 44" candidate, a selection for the top 44 players in the city. Ex. J (Letter from Yusuf Anifowoshe) at 1. His senior year, Mr. Anifowoshe led his team to its first championship in over 40 years and, as a track and field athlete, helped his school achieve a city record for the 4 x 100 and 4 x 200. *Id.* After going a stint in community college and then playing at Afred State College, Mr. Anifowoshe's commitment to his family called him back home. *Id.* Once back home, Mr. Anifowoshe finished his Associates Degree at Kingsborough Community College and worked for his uncle's security company. *Id.* at 1-2. Largely because of his family's work ethic, Mr. Anifowoshe has maintained a strong work history. (PSR, ¶¶89-92.)

As big of a role as Mr. Anifowoshe's family and sports have had in Mr. Anifowoshe's life, so too has his faith and church community have shaped him. Mr. Anifowoshe's mother raised him and his siblings going to church. Ex. J at 2. Indeed, Mr. Anifowoshe met his fiancé Niah Khan at a charity event at his church when they were teenagers. Ex. I. As Mr. Anifowoshe has grown, he has become an active member of his church, distributing free food to members and the homeless, and leading, joining, and volunteering in organizations in his community. *Id.* Ex. J. He has continued to rely on his faith as he's sought to understand how he his actions led him before the Court and how he must change going forward.

Despite Mr. Anifowoshe's strong family, community, convictions, work ethic, and faith, he has erred. Mr. Anifowoshe has been honest with his family and community about the conduct in this case and his sincere remorse for his decisions. *See, e.g.*, Ex. B ("In these circumstancesYusuf made a mistake which he has expressed to me over this time period how he wished this did not happen. How much he wishes he can take everything back."); Ex. E ("Yusuf has come to me personally and expressed just how awful he feels about his past mistakes and how he just wishes he could take it all back."). As Mr. Anifowoshe tells this Court, "[a]long the way I definiteily made some mistakes. . . . I still knew and know now the importance of accountability and have always held myself to these standards, living and learning as it all went by. . . . **I should have a do know better**[.]" Ex. J (emphasis added).

Mr. Anifowoshe has continued to move forward with the strength of his convictions and his moral compass. He is soon to be a father (by the time of sentencing his fiancé will be one week from her due date) and has every reason to continue being the sort of family patriarch that can guide his child going forward. Mr. Anifowoshe is adamant: "I do not and will not allow any more foolish mistakes or actions to take me away from him and my family." *Id.* at 2. As Mr. Anifowoshe tells the Court: "I am not my mistakes, I'm what I've learned from them." *Id.* at 3. He has already learned from this mistake.

2. **Even the Variance Recommended by Probation Would Result in a Greater Sentence than Necessary to Meet the Goals of Sentencing in This Case**

"[S]entencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012). The Supreme Court requires individualized sentencing, affirming "the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also Miller v. Alabama*, 132 S.Ct. 2455 (2012) ("punishment for crime should be graduated and proportioned to both the offender and the offense").

After conducting a 2-year study commissioned by the Department of Justice and the Catherine T. MacArthur Foundation, the National Research Council, Committee on the Causes and Consequences of High Rates of Incarceration in the United States concluded that: "[T]he weight of the scientific evidence on the consequences of high rates of incarceration, when viewed in light of the principles of proportionality, parsimony, citizenship, and social justice . . . , suggests that too many people are in prison in the United States and that, overall, their sentences are too long." *See* Travis, J. and Western, B., eds. *The Growth of Incarceration in the United States: Exploring Causes and Consequences*. Nat'l Research Council (2014), at 343, *available at* https://www.nap.edu/catalog/18613/the-growth-of-incarceration-in-the-united-states-exploring-causes. A custodial sentence would promote neither principles of proportionality nor parsimony.

A custodial sentence is out of step with a growing national and bipartisan consensus about the need for sentencing reform and to end mass incarceration. Not long ago, a group of over sixty elected prosecutors issued a joint statement on remedying extreme sentences, in which they state:

> [W]e urge our prosecutor colleagues to create policies in their offices whereby no prosecutor is permitted to seek a lengthy

> sentence above a certain number of years (for example 15 or 20 years) absent permission from a supervisor or the elected prosecutor. Changing presumptions in this way and making clear that these sentences should be reserved for the unusual and extraordinary case can have a significant impact moving forward by aligning the U.S. with the starting point around sentence length in place in other countries, and also move us away from the ramp up of mass incarceration seen over past decades.

*See* https://fairandjustprosecution.org/wp-content/uploads/2021/04/FJP-Extreme-Sentences-and-Second-Chances-Joint-Statement.pdf. While Mr. Anifowoshe is not facing the prospect of such a lengthy custodial term, the principle still stands: the high rates of incarceration in our criminal justice system are unwarranted and assumptions about appropriate sentences are not rooted in reality. It is these sentencing assumptions and policies which have recently led politicians to attempt to address overincarceration through "second look" and sentencing reform legislation. *See e.g.*, https://www.congress.gov/bill/116th-congress/house-bill/3795; https://www.judiciary.senate.gov/press/dem/releases/durbin-grassley-introduce-bipartisan-legislation-to-advance-the-first-step-acts-goals.

Perhaps most tellingly of the fact that the Sentencing Guidelines were fundamentally flawed in their entirety from the beginning is that the Sentencing Commission chose to exclude from its data set of preguideline sentences nearly fifty percent of the 10,000 cases in which *probation* was imposed. "[I]n determining preguideline sentencing practice, the Commission arbitrarily excluded sentences of probation. This decision significantly skewed the data relating to past practices because approximately fifty percent of the defendants in the preguideline era received sentences of probation." Lynn Adelman & Jon Deitrich, *Improving the Guidelines Through Critical Evaluation: An Important New role for District Courts*, 57 DRAKE L. REV. 575, 578 (2009) (footnotes omitted). In other words, the Guidelines ignored data that showed that the appropriate sentence for half of all defendants was a probationary term of imprisonment.

Looking past the Guidelines would more closely hue to thirty years of deterrence research showing that there is *no* evidence that severe prison sentences prevent crime, and would credit Mr. Anifowoshe's individual circumstances. While the Probation Office acknowledges the mitigating factors in this case and recommends a variance down to 18 months, its recommendation is necessarily problematic because it remains tied to the nonempirical and flawed Sentencing Guidelines. Instead, a probationary term, or a time-served term is appropriate here.

### 3. Continued Difficulties Posed by the Covid-19 Pandemic

Congress has instructed the Court to "consider" whether the sentence imposed will "provide defendants with needed education or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), and the conditions of confinement. *See* 28 U.S.C. §944(g) (instructing sentencing commission to take into account nature of correctional facility).

The conditions of confinement continue to be detrimental to the fundamental rehabilitative purpose of sentencing. Rehabilitation continues to be limited in BOP by the necessities of the COVID-19 pandemic. To respond to the COVID-19 pandemic, many BOP facilities continue to implement modified operation plans, which limits social visits, inmate movement, and has suspended all volunteer visits, including visits from religious advisors. Under these modified operations, Mr. Limón may be unable to receive programming and rehabilitative resources, and instead, could be confined in his assigned cells/quarters. Indeed, since he has been in custody, Mr. Limón has been unable to do any programming. District courts across the country have considered at the time of sentencing these continued conditions of confinement. *See United States v. Indarte*, No. 17-5554 BHS, 2020 WL 6060299, at *4 (W.D. Wash. Oct. 14, 2020) (recognizing § "3553(a) factor relating to the 'need for just punishment' has dramatically shifted since sentencing [and] the lock-down measures. . . have made confinement much more punitive than was contemplated at sentencing."). Other courts have noted during sentencing the lack of programming opportunities during COVID-19. *See, e.g.*, *United States v. William*

*White*, 19-cr-325-RC (D.D.C. Aug. 5, 2020) (referring to more punitive and less rehabilitative conditions at the jail due to COVID-19); *United States v. Antonio Cox*, 19-cr-235-JDB (D.D.C. July 29, 2020) (acknowledging lack of programming due to COVID-19).

**B.   Restitution**

Restitution, jointly and severally, as determined by the Court at sentencing.

### IV. CONCLUSION

For the reasons stated above, Mr. Anifowoshe respectfully asks this Court to impose a time-served sentence or a term of probation followed by a six-month term of home confinement, restitution as determined by this Court at sentencing, and a one-year term of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 22, 2022        By  */s/ Carel Alé*
                              CAREL ALÉ
                              Deputy Federal Public Defender
                              Attorney for YUSUF ANIFOWOSHE